

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MKM:JPL/TH
F. #2010R02042

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 11, 2019

By ECF

The Honorable Eric N. Vitaliano
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. John Servider
                 Criminal Docket No. 15-174 (ENV)

Dear Judge Vitaliano:

      The government respectfully submits this letter in connection with the defendant John Servider's sentencing, which is scheduled for April 12, 2019 at 11:00 a.m. On May 25, 2018, after a seven-day trial, the defendant was found guilty of Counts Nine and Ten of the above-referenced indictment, charging the defendant with corruptly altering records for use in an official grand jury investigation, and conspiring to commit the same, in violation of Title 18, United States Code, Sections 1512(c)(1) and 1512(k).

      For the reasons set forth below, the government respectfully submits that a sentence at the top of the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range is necessary to account for the serious crimes committed by the defendant.

I.     Background

      As the Court is well aware from having presided over the jury trial, this case arises from a grand jury investigation in the Eastern District of New York into several fraudulent schemes orchestrated by the owners, principals and associates of Crimson Construction Corporation ("Crimson"). For many years, the defendant Servider was the personal attorney for Vincent Vertuccio, who was a silent controlling partner of Crimson and

a target of the grand jury investigation. (PSR ¶ 6; GX 8).[1]  As established at trial and set forth in greater detail below, as the lawyer for Vertuccio and Crimson, Servider participated in, furthered and concealed many of the fraudulent schemes that were the subject of the grand jury investigation. Servider's pattern of Crimson-related obstructive behavior culminated in his crimes of conviction when, in March 2013, he conspired with Vertuccio and others to alter invoices and sales receipts issued by a jewelry store so as to remove Vertuccio's name from the records before they were returned to the grand jury, thereby hiding Vertuccio's taxable income secretly earned through Crimson. (PSR ¶¶ 22, 23).

      A.     <u>Union Doublebreasting, Cash Payroll, and Sham Companies</u>

Crimson was a New York corporation that had offices in Brooklyn and Queens, was originally formed in approximately 2005 by two contractors, Luke Czachor and Chris Cielepak, and specialized in projects involving reinforced concrete structures, foundations, finished concrete, masonry, brick, tile and stone work. (PSR ¶ 6). After Crimson's formation, Vertuccio inserted himself into Crimson as a "silent partner" who withdrew as much as $10,000 in cash per month from Crimson, taking control of the business and directing its activities. (<u>Id.</u>).

In contravention of the collective bargaining agreements that Crimson signed with various labor unions, Crimson conducted a substantial portion of its construction business under the company name "Skynear," in order to avoid making the hourly wage and Local 1 Benefit Fund payments as required. (PSR ¶¶ 7-9). Crimson also paid, and caused Skynear to pay, wages far below the prevailing wage to many workers who performed masonry work on Crimson's projects within the Local 1 Geographical Area, including to non-union workers. To conceal its illegal underpayment of wages and avoid leaving a paper record of the illegally low wages, Crimson paid, and caused Skynear to pay, some of these workers in cash. (PSR ¶ 10; <u>see also</u> T. 389-392). As a result, Vertuccio and his co-conspirators illegally kept money for themselves that they were obligated to pay to, among other beneficiaries, its workers and union representatives. (PSR ¶ 9).

In order to obtain the large amounts of cash necessary to pay some of the non-union workers and to pay himself, Vertuccio directed Crimson's accountant, Praful Pandya, to repeatedly cash multiple checks on the same day in amounts below $10,000 in order to evade currency transaction filing requirements and thus avoid law enforcement scrutiny. (PSR ¶¶ 10-13; <u>see also</u> T. 265-266). To facilitate this "cash exchange" scheme, Vertuccio, Pandya and others passed funds through multiple shell companies to create the false appearance that the transactions were legitimate construction-related expenses, when they were not. (<u>See</u> PSR ¶¶ 10-13; <u>see also</u> T. 246-249, 262-269).

---

[1]     Parenthetical references to "PSR", "GX" and "T." are to the January 8, 2019 Presentence Investigation Report, as amended on April 3, 2019, government trial exhibits, and the trial transcript, respectively.

Beginning in 2008, Crimson, Skynear, Czachor and Cielepak were named as defendants in a lawsuit related to the union doublebreasting scheme and cash payroll. (See PSR ¶ 13; T. 430; see also, generally, Nawrocki et al. v. Crimson Construction Corp. et al., Docket No. 08-CV-3153 (MKB) (E.D.N.Y.)). In anticipation of Cielepak's and Czachor's depositions in connection with that lawsuit, the defendant Servider and Vertuccio coached Cielepak and Czachor to testify falsely about the true and common ownership and control of Crimson, Skynear and the shell companies used in the cash exchange scheme. (See T. 430-434; PSR ¶ 13). As a result, Cielepak provided false deposition testimony in connection with that lawsuit. (See T. 431).

   B. <u>The Defendant's Assistance to Vertuccio in Obtaining Unreported Income from Crimson</u>

Between 2008 and 2011, Vertuccio directed that a substantial amount of money from Crimson's bank accounts be used to pay for his personal expenses and engaged in various schemes for his financial benefit, which Vertuccio failed to report as taxable income on his federal income tax returns. (PSR ¶¶ 16, 17). For example, in or around 2009, Vertuccio caused multiple checks for hundreds of thousands of dollars to be made payable to a company, R&R Block and Brick ("R&R"), that appeared to be a vendor providing construction related services. (PSR ¶ 17). An individual associated with R&R would, for a fee, cash the checks at a check-cashing firm and then give the money to Vertuccio and Cielepak, who would then split the money. (PSR ¶ 17; T. 411). Vertuccio and Cielepak met with the defendant and sought his advice as to how they could carry out this check-cashing scheme without getting caught. (See T. 411-412). Servider advised Vertuccio and Cielepak to obtain a phony contract and insurance certificate to protect themselves in case they were later questioned about these checks, which they did. (See PSR ¶ 17; T. 411-412).

In and around 2008 through 2009, Servider helped Vertuccio and Cielepak execute yet another check-cashing scheme through a construction supply company called Miron Building Supply ("Miron"). (See T. 397-399). The purpose of this scheme, like the others, was to obtain money from Crimson without reporting or paying income tax. (See T. 399). At the time, Servider was also the lawyer for Miron. (PSR ¶ 20; see also T. 398). In furtherance of this scheme, the defendant prepared fictitious Miron receipts to make the cash exchanges appear legitimate, repeatedly obtained $10,000 in cash from Miron, hand-delivered the cash to Crimson, and, thereafter, Servider, Vertuccio and Cielepak split the proceeds of the scheme amongst themselves. (See T. 397-401, 404-405).

Moreover, Vertuccio, who was renovating his personal residence, engaged in another scheme to obtain materials from Miron that he needed for his home renovation without personally paying for them. (PSR ¶ 20). Vertuccio directed Crimson to place orders for those materials with Miron and the orders were made to appear as if they were for an actual Crimson construction project, but were in fact delivered to Vertuccio's personal residence for his personal use and benefit. (PSR ¶ 20; T. 405).

   C. <u>The Defendant's Concealment of Crimson's Assets from Creditors</u>

3

In 2010, Crimson defrauded the Port Authority of New York and New Jersey in connection with the One World Trade Center project located in lower Manhattan. Specifically, Vertuccio directed an employee of Crimson, who was bidding for work on the One World Trade Center project, not to disclose Vertuccio's role in Crimson because of Vertuccio's ties to organized crime and Vertuccio's prior felony tax conviction. (See PSR ¶¶ 14-15; T. 414-16). Hundreds of thousands of dollars of proceeds of that fraud were laundered through Servider's attorney escrow account to Vertuccio's benefit, rather than used for the intended purpose of reconstructing the World Trade Center. (See T. 484; see also PSR ¶¶ 14-15; GX 401, 402, 403). These funds were routed as such in order to frustrate the abilities of creditors, including state tax authorities, to locate Crimson's assets and to collect on liens filed against Crimson during a time when Crimson's own bank accounts were frozen. (See T. 417-419; GX 101A; see also T. 273).

Over the years, Servider also took steps to wrongfully shield Crimson's and its principal's assets from creditors. For example, in 2011, Servider prepared and improperly notarized a stock transfer certificate backdated to 2009 that falsely purported to transfer ownership of Crimson from Cielepak, who had sizeable personal assets, to Czachor, who did not. (See PSR ¶¶ 24-26; see also T. 274-280, 422-428; GX 10). The transfer of ownership was used to file false tax returns claiming that Czachor was the sole owner of Crimson during 2009 and 2010 when the business had accrued a significant amount of unpaid taxes. (See PSR ¶¶ 24-26; see also T. 274-280, 422-428).

        D.        <u>The Corrupt Alteration of Records Subpoenaed by the Grand Jury</u>

In March 2013, a grand jury in the Eastern District of New York was investigating Crimson and Vertuccio in connection with these schemes and issued several subpoenas to businesses that had received funds from Crimson. Among other things, the grand jury and the government were investigating the flow of funds through Crimson to businesses that had supplied goods and services to Vertuccio, even though Vertuccio had not reported those goods and services as taxable income on his federal personal income tax returns. (See PSR ¶¶ 22-23; see also T. 51-58).

One such grand jury subpoena, served on a Raineri Jewelers, Inc., a Manhattan jewelry store, requested any and all "records relating to the purchase, sale, receipts, or delivery of goods or services" in connection with a number of businesses and individuals, including Crimson and Vertuccio. (GX 1). Servider and Vertuccio then conspired to alter invoices and sales receipts issued by the jewelry store so as to remove Vertuccio's name from the records before they were returned to the grand jury, thereby hiding Vertuccio's taxable income. (PSR ¶ 22). Servider met with the owner of the jewelry store to delete references to Vertuccio from the invoices and receipts prior to their production to the grand jury. (See GX 201-T, at p. 9). A few weeks later, the jewelry store responded to the subpoena by providing invoices and receipts from which Vertuccio's name had been removed. (Compare, e.g., GX 1A with GX 4 and GX 5). Servider also met with Cielepak, reviewed the receipts and invoices that were altered to reflect Cielepak's name, circled additional alterations that needed to be made, and instructed Cielepak to lie if questioned by

law enforcement and claim that he (Cielepak) bought the jewelry for people as gifts. (See T. 459, 466; GX 5).

Indeed, Servider acknowledged in a recorded conversation on May 21, 2013, that the receipts and invoices were altered to reflect Cielepak's name:

| | |
|---|---|
| CIELEPAK: | [Raineri] went down there. |
| SERVIDER: | No, he didn't go. He just gave all the documents. He didn't have to go. He just turning all the documents. [Lowers voice] But he had all the ones I showed you, you know. He had the ones for Vinny [Vertuccio] . . . . |

\*     \*     \*

| | |
|---|---|
| CIELEPAK: | So all of them are going to say me? |
| SERVIDER: | I guess, if it's still going on. |

(GX 200-T, at p. 4; T. 516). Similarly, Vertuccio confirmed the obstruction scheme in a recorded conversation on February 24, 2014:

| | |
|---|---|
| CIELEPAK: | So what's my story? When these guys fucking come to me and say why'd you buy all of this jewelry, how do I say I fucking paid for all of this? |
| VERTUCCIO: | You gotta say whatever John [Servider] tells you. You gotta talk to your lawyer about that. But John says, you know, you bought the stuff and you gave them as gifts. |

(GX 201-T, at p. 4; T. 516).

Finally, the defendant Servider and Vertuccio, in addition to altering the Raineri Jewelry receipts and invoices, took even more steps to obstruct the investigation. Knowing that Crimson, Cielepak and Czachor were under investigation, Servider and Vertuccio instructed Cielepak to destroy evidence including his Crimson business paperwork and jewelry from Raineri Jewelers, and to lie if questioned by law enforcement about checks written from Crimson to Vertuccio's wife. (See T. 453-454). Servider also instructed Cielepak to bribe Czachor, who had by then been arrested, in exchange for Czachor's silence. (See T. 453-456).

5

II.  Applicable Guidelines Range

The government submits that the following Guidelines calculation applies, which is consistent with the PSR:

| | |
|---|---|
| Base Offense Level (§ 2J1.2(a)) | 14 |
| Plus:  Alteration of Probative Records (§ 2J1.2(b)(3)(B)) | +2 |
| Plus:  Role Adjustment: Use of Special Skill (§ 3B1.3) | +2 |
| Total: | 18 |

Because the defendant in within Criminal History Category I, the corresponding Guidelines range of imprisonment is 27 to 33 months.

In his sentencing submission, the defendant objects to various aspects of the Probation Department's Guidelines calculation, in particular: (i) the two-point enhancement for alteration of probative records pursuant to U.S.S.G. § 2J1.2(b)(3)(B); (ii) the two-point enhancement for the defendant's use of a special skill pursuant to U.S.S.G. § 3B1.3; and (iii) the absence of a two-point reduction for the defendant's claimed mitigating role in the offense pursuant to U.S.S.G. § 3B1.2. Each of these objections is belied by the record and should be rejected.

A.  The Jewelry Store Receipts and Invoices Were Especially Probative

The defendant contends that the altered jewelry store invoices and receipts were not "essential or especially probative records" pursuant to U.S.S.G. § 2J1.2(b)(3)(B). The defendant's argument is premised on the assumption that because the government could have convicted Vertuccio for other forms of tax fraud without the original unaltered jewelry store records, and did so, the records are de facto non-essential. By that logic, the defendant would have had to entirely dismantled the government's case against Vertuccio, or destroyed each and every relevant document, for this enhancement to apply. That is not the standard. For instance, there is a separate Guidelines enhancement – not applied here – where a defendant's obstruction goes that far. See U.S.S.G. § 2J1.2(b)(2) ("If the offense resulted in substantial interference with the administration of justice, increase by 3 levels."). Moreover, the only case cited by the defense in support of this argument, United States v. Mathews, 874 F.3d 698 (11th Cir. 2017), does not support as bold and broad a standard as advocated by the defense. To the contrary, in Mathews, the Eleventh Circuit affirmed a lower court's application of the U.S.S.G. § 2J1.2(b)(3)(B) enhancement where a defendant modified a medical record that was not essential to a regulatory investigation of the quality of care provided to a patient, and where that the record would merely "furnish, establish, or contribute toward proof (i.e., be especially probative) on that point," 874 F.3d at 705 (internal quotation marks and alterations omitted).

6

The defendant contends that the altered jewelry store invoices and receipts were not "essential or especially probative records" pursuant to U.S.S.G. § 2J1.2(b)(3)(B). This argument is entirely baseless. The sole case cited by the defendant in support of this argument, United States v. Mathews, 874 F.3d 698 (11th Cir. 2017), upheld the application of the U.S.S.G. § 2J1.2(b)(3)(B) enhancement where a defendant modified a medical record that was essential to a regulatory investigation of the quality of care provided to a patient, and where that the record would merely "furnish, establish, or contribute toward proof (i.e., be especially probative) on that point," 874 F.3d at 705 (internal quotation marks and alterations omitted). The defendant's argument hinges on the faulty premise that because the government could have charged Vertuccio for other forms of tax fraud without the aid of the original unaltered jewelry store records, the records could not have been essential or especially probative to its investigation. That is not the standard to be applied here.[2] The accurate and unaltered jewelry store invoices and receipts – which have never been obtained and are presumably destroyed forever – would have undoubtedly contributed toward proof of the existence of the tax fraud under investigation and scope of that scheme. Moreover, the alteration of jewelry store receipts and invoices did thwart the government's ability to determine the amount of unreported income earned by Vertuccio, a significant aspect of the investigation. Thus, the altered records were essential and especially probative to the government's and the grand jury's ability to fully investigate the scope of the tax fraud, or to assess and recover the proper amount due to the IRS.

The defendant also points to Vertuccio's tax liability of $374,057.30 seemingly to characterize the income received via jewelry purchases as de minimis. However, the total value of jewelry listed on the altered invoices returned to the grand jury exceeds $600,000 (see GX 1A) – not a mere "drop in the bucket," Def. Mem. at 6, by any standard. Indeed, the amount of unreported income earned by Vertuccio and others at Crimson through jewelry store purchases may have been one of the most significant sources of unreported income, but due to the defendant's alteration and destruction of those records, the government, and the Court, will likely never know that for certain.

Finally, the extent to which the jewelry store receipts and invoices were tampered with is also demonstrative of their significance. As proven at trial, the defendant and his co-conspirators made select, subtle and precise alterations, deletions and modifications to the invoices before returning them to the grand jury. The very care with which those records were altered is overwhelming proof that they were "essential or especially probative records" in the investigation of Vertuccio's and Crimson's tax crimes

---

[2] By that logic, the defendant would have had to entirely dismantle the government's case against Vertuccio, or destroyed each and every relevant document, for this enhancement to apply. That cannot be the case. For instance, there is a separate Guidelines enhancement – not applied here – where a defendant's obstruction goes that far. See U.S.S.G. § 2J1.2(b)(2) ("If the offense resulted in substantial interference with the administration of justice, increase by 3 levels.").

7

and within the meaning of U.S.S.G. § 2J1.2(b)(3)(B), such that this two-point enhancement should apply.

      B.      The Defendant's Misuse of His Legal Training and Experience

The defendant argues that he did not "use[] a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In support of his argument, the defendant cites United States v. Elefant, 999 F.2d 674 (2d Cir. 1993), for the proposition that a defendant whose special skill merely places them in an opportune position to commit a crime does not necessarily merit the enhancement at issue. Although, like the defendant in Elefant, Servider was in a position to learn of the obstruction because of his special skill, unlike Elefant, Servider also used his special knowledge and skills to further the obstruction and the conspiracy.[3] Indeed, Servider was clearly recruited to commit the obstruction and further the offense because of his legal expertise.

Notably, Application Note 4 to Guideline § 3B1.3 specifically references "lawyers" as individuals who possess the requisite special skills to merit this enhancement. While a lawyer may not exploit his or her unique skills to perpetrate every crime, for example, a bank robbery, a criminal defense attorney's special skills, knowledge and training are indispensable when carefully modifying and altering records to obstruct and impede a grand jury investigation.

Had Vertuccio not needed the skills of his corrupt personal attorney to effectively alter the jewelry store receipts and impede the grand jury investigation, perhaps he would have conspired with the jewelry store owner alone. Instead, Servider served as a critical intermediary between Vertuccio and the jewelry store, particularly when Vertuccio was travelling abroad, as demonstrated by the various telephone and fax records entered into evidence at trial. (See GX 400). Additionally, as proven at trial, in the days and weeks leading up to the service of the subpoena on the jewelry store, Servider had already carefully scrutinized the grand jury investigation and made careful, analytical decisions about its scope. (See, e.g., GX 8 (February 1, 2013 letter from Servider to Pandya's attorney seeking information about records subpoenaed by and returned to the grand jury); see also T. 294). This legal expertise and experience led Servider to develop effective ways to unlawfully impede the grand jury investigation and further the obstruction crimes.

Finally, as noted above, Servider misused his legal training and license in many other ways to further various obstructive acts on behalf of Crimson and its owners and

---

      [3]      In Elefant, a Hebrew translator learned of an investigation of a money laundering ring through an assignment translating intercepted communications for federal law enforcement agents and disclosed the existence of that investigation to the ring's participants out of a misguided sense of loyalty, and stole government documents, 999 F.2d at 675-676. Although the defendant in Elefant learned of the investigation through his translation skills, his language abilities served no purpose in furthering his crime of conviction: theft of government property under 18 U.S.C. § 641.

8

associates, which included, but was not limited to, trainings on how to provide false testimony, preparing phony paperwork, and wrongfully concealing Crimson's assets from creditors.

        C.        <u>The Defendant Was Not A Minor Participant in the Obstruction</u>

The defendant was not a minor participant in the obstruction and no role reduction pursuant to U.S.S.G. § 3B1.2 is merited in this case. Despite the defendant's claim to the contrary, every single factor enumerated in Application Note 3(C) to Guideline § 3B1.2 demonstrates that this adjustment is inapplicable. *First*, having been the long-time counsel to Vertuccio and Crimson and participating in and furthering many criminal and obstructive schemes over the years, Servider was fully aware of the "scope and structure of the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3(C)(i). *Second*, Servider was intimately involved "in planning or organizing the criminal activity," and even led the efforts to alter the invoices while Vertuccio was travelling and unavailable to do so himself. U.S.S.G. § 3B1.2 cmt. n.3(C)(ii). *Third*, Servider had significant "influence[] over the exercise of decision-making authority," which is perhaps best exemplified by Servider's circling of the words "for Vinny" on one of the invoices faxed to him by the jewelry store and the removal of those exact words in the version of the invoices provided to the grand jury. U.S.S.G. § 3B1.2 cmt. n.3(C)(iii). *Fourth*, the "nature and extent of the defendant's participation in the commission" of the obstruction was commensurate to that of Vertuccio. U.S.S.G. § 3B1.2 cmt. n.3(C)(iv). *Finally*, although "the defendant stood to benefit from the criminal activity" likely less than Vertuccio, because Servider was a long-time participant in many of the criminal and fraudulent schemes of Crimson, he also stood to benefit significantly by thwarting the grand jury investigation into those schemes that also were likely to lead back to his own criminal misconduct. Notably, Servider stood to benefit from the obstruction more than the jewelry store owner. In sum, because Servider was not "substantially less culpable" than others engaged in the conspiracy to alter the records, no adjustment in warranted pursuant to U.S.S.G. § 3B1.2

III.    <u>Appropriate Sentence</u>

For the reasons set forth below, a consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) supports imposition of a term of imprisonment of 33 months, a sentence at the top of the applicable Guidelines range.

        A.        <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense favor a sentence within the applicable Guidelines range. The defendant betrayed his oath and duty as a member of the bar and, instead, exploited his knowledge and expertise as a criminal defense attorney to obstruct a federal grand jury investigation into one of his clients. The defendant was pivotal to the scheme for many reasons. *First*, Servider personally engaged with the jewelry store owner to make precise changes to the invoices and receipts resulting in the destruction and manipulation of evidence. The degree of precision and thoughtfulness with which the

9

alterations were made was extreme; removing all possible, even fleeting references to Vertuccio while also accounting for information that could not be whitewashed or denied because of other evidence that the conspirators knew was already available to the government. *Second*, Servider instructed his co-conspirators on how to consistently maintain the secrecy of the scheme. *Third*, Servider's obstructive conduct was successful and effective; the government is still unable to conclusively determine the value of the underreported income earned by Vertuccio through illicit jewelry purchases.

The defendant's falsified records were, in fact, returned to the grand jury. Had the government not obtained alternate copies of the jewelry store invoices and receipts, there is no doubt that the grand jury would have mistakenly relied on the falsified records as accurate. Moreover, but for the government's investigation, the defendant himself may have offered these records to the Court or to a trial jury as evidence tending to exonerate his client and falsely inculpate a government witness, while knowing all along that he had conspired to doctor the invoices and sales receipts, and manufactured a deceitful and disingenuous counter narrative.

### B. History and Characteristics of the Defendant

The defendant's history and characteristics also weigh strongly in favor of a Guidelines sentence. Although this is the defendant's first conviction, the government established at trial that the defendant engaged in numerous other crimes and bad acts besides the crimes of conviction. As described in greater detail above, these include:

1. Coaching Cielepak and Czachor how to provide effective false deposition testimony in connection with a civil lawsuit in this District;

2. Participating in and profiting from the Miron check-cashing scheme, and helping Vertuccio and Cielepak to obtain false paperwork to conceal the Miron and R&R check-cashing schemes;

3. Concealing Crimson's assets within his attorney escrow account to frustrate creditors' abilities to collect debts owed;

4. Falsely backdating and notarizing a stock transfer certificate also to frustrate creditors' abilities to collect debts owed; and

  5. Instructing Cielepak to destroy other Crimson-related evidence, to lie about transactions purportedly with Vertuccio's mother, and to bribe and tamper with Czachor, a potential government witness.[4]

Nothing in the defendant's sentencing submission indicates that he was experiencing particular challenges that would explain his actions or put them in context. To the contrary, the defendant was a practicing attorney with a viable practice.

In seeking a non-custodial sentence, the defendant significantly downplays his conduct. The defendant's claim that his representation of Crimson was "an aberration in an otherwise unblemished" professional life, Def. Mem. at 8, is belied by his long history of aiding, assisting and profiting from Vertuccio's misdeeds and fraudulent schemes. For this reason, the defendant was also incentivized to obstruct the grand jury investigation and to deflect suspicion away from his own crimes. This egregious history of deceit and abuse of trust establishes a pattern of dishonest conduct, which is particularly disturbing for a practicing attorney.

  C. Need to Promote Respect for the Law, Provide Just Punishment and Afford Adequate Deterrence

The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law," and "to afford adequate deterrence to criminal conduct" also weigh in favor of a Guidelines sentence. 18 U.S.C. § 3553(a)(2). The grand jury process is a sacred

---

[4] In his sentencing submission, the defendant asserts that much of this relevant conduct should be stricken from the PSR. The government submits that the trial evidence in this case, including the extensive testimony of two cooperating witnesses who plead guilty to many of these schemes, established by at least a preponderance of the evidence that these schemes occurred and that the defendant took part in them to the degrees set forth herein and in the PSR. The defendant appears to take particular exception to the Miron check-cashing and fake invoicing scheme and relies upon the testimony of Bernd Messing in doing so. But the government's proof at trial did not implicate Messing in the scheme. (See T. 666-669 (Messing's testimony regarding the defendant's possession of Crimson invoices that he withheld from Miron despite multiple unanswered demands); GX 14 (Letter from Messing to the defendant demanding copies of Crimson invoices)). Moreover, the defendant's own recorded statements corroborate that "Tony" was a Miron insider and would keep the defendant informed about the scheme, and that the defendant was relieved that Miron went bankrupt because the government would be unable to obtain Miron's business records for its investigation. (See T. 502; GX 200-T, at p. 11). Finally, the defendant's apparent suggestion that the supposed lack of a cash register proves the absence of the scheme is a red herring. Specifically, Messing equivocated and could not recall whether there was a cash register at Miron but, notably, he did recall that there was a safe. (T. 655:15-16 ("I don't remember no cash register, because there was no walk-ins. We had a safe there.")).

institution within our criminal justice system that determines whether a crime has been committed and by whom. Obstructing and corrupting the integrity of that process can lead to the guilty being set free, and the innocent being wrongly accused. Either scenario can result in a grave miscarriage of justice and erodes the public's confidence in our judicial system. No one should have understood this better than someone like the defendant. A Guidelines sentence would send a clear and decisive message to the defendant, and to the public, that protecting the integrity of our judicial institutions is of paramount importance and that efforts to destroy them will be met with meaningful consequences.

IV. <u>Conclusion</u>

Because each sentencing factor supports the need for a Guidelines sentence, the Court should reject the defendant's request to impose a non-custodial sentence and should impose a sentence of imprisonment of 33 months, at the top of the applicable Guidelines range.

                                                         Respectfully submitted,

                                                         RICHARD P. DONOGHUE
                                                         United States Attorney

By:                      /s/
                                                         Jonathan P. Lax
                                                         Tanya Hajjar
                                                        Assistant U.S. Attorneys
                                                        (718) 254-6139/6109

cc:     Maurice H. Sercarz, Esq. (by ECF and e-mail)
          Robert Caliendo, Esq. (by ECF and e-mail)